**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re | |
| **Aetius Companies, LLC, et al.,**[1] | Case No. 23-30470 |
| Debtor | Chapter 11 |

## DECLARATION OF MARK COTE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF

I, Mark Cote, hereby declare, under penalty of perjury, as follows:

1.       I am the Chief Executive Officer ("CEO") of the above captioned debtors and debtors-in-possession (collectively, the "Debtors").  I have been the President since September 12, 2022 and CEO of the Debtors since May 16, 2023.

2.       In an effort to save corporate overhead, the Debtors share certain corporate employees with another company, Tantum Companies, LLC.  Tantum Companies, LLC is also a debtor in this Court (Case No. 23-30407).  Under this arrangement, certain corporate employees, including myself, perform corporate functions for each of the Debtors and Tantum Companies, LLC.  I therefore also serve as the CEO of Tantum Companies, LLC.

3.       In my capacity as the Debtors' CEO, I am familiar with the Debtors' financial affairs, the circumstances giving rise to the Debtors' financial distress, and the Debtors' restructuring prospects.

---

[1] The last 4 digits of Debtor's TIN is 6613.  Subsidiaries and the last 4 digits of each TIN are: Aetius Restaurant Group, LLC (7251); Aetius Franchising, LLC (6732); Aetius Restaurant Holdings, LLC (7336); Aetius Holdings, LLC (7170); SW Charlotte LLC (8864); Charlotte Uptown Wings, LLC (7381); Jacksonville WWC, LLC (0550); Raleigh Wings, LLC (1397); Wild Wing of Hilton Head, LLC (3297); South Carolina Wings LLC (8706); Mt Pleasant Wings LLC (9325); Greenville Wings LLC (8393); North Charleston Wings LLC (1178); Wilmington Wings LLC (3930); Bluffton Wings LLC (2809); Columbiana Wings LLC (1917); Vista Wings LLC (4390); Wings Over Spartanburg LLC (5276); Sandhill Wing, LLC (6057); Anderson Wings, LLC (5203); Gastonia Wings, LLC (0167); Greenville WWC, LLC (2103); and Savannah WWC, LLC (4043).

4.        I submit this declaration (the "First Day Declaration") in support of the Debtors'

chapter 11 petitions and requests for relief contained in certain "first day" applications and motions

filed on or shortly after the date hereof (the "First Day Motions").[2]

5.        On July 19, 2023 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith,

the Debtors filed a motion seeking joint administration of these Chapter 11 Cases for procedural

purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules").

6.        Except as otherwise indicated below, all facts set forth in this First Day Declaration

are based upon my personal knowledge of the Debtors' operations and finances, information

learned from my review of relevant documents, information supplied to me by members of the

Debtors' management, senior employees, and advisors, or my opinion based on my professional

experience.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if

called upon to testify, I could and would testify competently to the facts set forth herein.

7.        Part I of this First Day Declaration provides background regarding the Debtors

including, but not limited to, the Debtors' corporate structure, capital structure, and debt structure.

Part II of this First Day Declaration provides a summary of the events which precipitated these

Chapter 11 Cases, and the Debtors' goals in these Chapter 11 Cases. Part III sets forth the relevant

details of the various First Day Motions.

---

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day
Motion.

## I.    BACKGROUND REGARDING THE DEBTORS

8.     Aetius Companies, LLC ("Aetius"), and its related subsidiaries, as an enterprise, own and operate the restaurant business known as "Wild Wing Cafe" ("WWC").  Aetius is the parent company, and all the other Debtors are direct or indirect subsidiaries of Aetius.  An organizational chart showing the Debtors' corporate structure is attached hereto as Exhibit A.

9.     Founded in 1990, WWC is a sports themed brand, with live, local/regional entertainment.  Known as the destination for "hot wings, cold beer and good times," WWC offers consumers a broad selection of fresh, made to order food items, including its 33 signature wing flavors and a wide range of beverages.  WWC operates 24 locations in six states across the Southeast.  For more than three decades, WWC has established a strong brand presence across its geographic markets predicated on offering consumers a great dining and entertainment experience. WWC serves a diverse customer base through its multiple dayparts (dinner, and late night) and off premise sales. The WWC concept  is a family dining destination, a place for young adults to come for good food and drinks, a place to watch sports, a lunch destination for professionals, and a live music venue.

10.     Currently, the Debtors operate six corporate owned restaurant stores located in N. Charleston SC, Raleigh NC, Gastonia NC, Anderson SC, Greenville, SC and Bluffton, SC.  In addition to the corporate owned stores, the Debtors have eighteen franchised locations located in Georgia, Alabama, North Carolina, Virginia, Tennessee, and South Carolina.

### Debt Structure/Prepetition Loans

#### HomeTrust Bank

11.     Aetius, one of the Debtors herein, is obligated to HomeTrust Bank ("HomeTrust") for a loan (the "HomeTrust Loan") in the original principal amount of $12,500,000.00 under that

i) certain Loan Agreement dated December 2, 2020 between Aetius Companies, LLC and HomeTrust (the "HomeTrust Loan Agreement") and that ii) certain Promissory Note in the principal amount of $12,5000,0000 dated as of December 2, 2020 (the "HomeTrust Note").

12.    The HomeTrust Loan is secured by i) that certain Security Agreement dated December 2, 2020 by and between Aetius, and Aetius Intermediate Company, LLC, Aetius Franchising, LLC, Aetius Restaurant Holdings, LLC, Aetius Restaurant Group, LLC, Jacksonville WWC, LLC, Savannah WWC, LLC, SW Charlotte, LLC, Charlotte Uptown Wings LLC, Gastonia Wings LLC, Raleigh Wings, LLC, Wilmington Wings LLC, Anderson Wings, LLC, Bluffton Wings, LLC, Columbiana Wings, LLC, Sandhill Wing LLC, Vista Wings, LLC, Greenville WWC LLC, Wild Wing Of Hilton Head LLC, Wings Over Spartanburg, LLC, Wings Over Spartanburg II, LLC, North Charleston Wings, LLC, Dunwoody Wings LLC, Wild Wing Of Aiken, LLC, Wild Wings Of McDonough, LLC (together, the "Guarantors"), and HomeTrust (the "HomeTrust Security Agreement"), which grants Home Trust a blanket lien on all personal property of the Debtors, and that ii) that certain Guaranty Agreement dated as of December 7, 2020, by and between the Guarantors and HomeTrust (the "HomeTrust Guaranty, together with the HomeTrust Loan Agreement, the HomeTrust Note, the HomeTrust Security Agreement, and any other documents related to the HomeTrust Loan, the "HomeTrust Loan Documents."

13.    The HomeTrust Loan was made through the Main Street Lending Program ("MSLP"), which was a loan program established by the Federal Reserve to make loans to small and medium sized business impacted by the COVID-19 pandemic.  Upon information and belief, HomeTrust is a participant bank in MSLP, and is also the administrative agent for the HomeTrust Loan on behalf of the MSLP.  Upon information and belief, as of the date the HomeTrust Loan

was made, HomeTrust's participation in the loan was 5%, or $625,000.00, and the MSLP's participation was 95%, or $11,875,000.00.

14.    The HomeTrust Loan is set to mature on December 7, 2025.  Additionally, principal paydowns of 15% of the principal balance are due and payable on December 7, 2023 and December 7, 2024.

15.    Prior the Petition Date, HomeTrust notified the Debtors that they were in default under the HomeTrust Loan Agreement and HomeTrust Note, and based upon such defaults, accelerated the balances due under the HomeTrust Loan.

16.    The Debtors dispute that certain defaults existed under the HomeTrust Loan and have communicated that to Home Trust.

### *The SBA Loan*

17.    In addition to the HomeTrust Loan, Aetius is obligated to the U.S. Small Business Administration (the "SBA") for a loan in the original principal amount of $500,000 (the "SBA Loan") pursuant to the i) Loan Authorization and Agreement ("SBA Loan Agreement") by and between Aetius and the SBA dated as of March 25, 2022, and ii) a Note in the principal amount of $500,000 dated as of March 25, 2022 (the "SBA Note").  The SBA Loan is secured by the Security Agreement dated March 25, 2022, by and between Aetius and the SBA (the "SBA Security Agreement"), granting the SBA a blanket lien on all personal property of Aetius.  Based upon a UCC search, the Debtors were unable to locate a UCC-1 Financing Statement filed in association with the SBA Loan.

18.    The SBA Loan matures and is due and payable on March 25, 2052.  As of the Petition Date, the current balance of the SBA Loan is $500,000.00.

## II.   SUMMARY OF PRECIPITATING EVENTS AND GOALS OF THESE CHAPTER 11 CASES

19.     Like many restaurant brands, WWC has experienced significant headwinds, unprecedented operational challenges, and severe pressure on margins as a result of the COVID-19 pandemic.  During the pandemic, any chance of dealing with operational issues in the normal course of business was extremely challenging and disruptive to the WWC's guests and employees. Operational control and management effectiveness were disrupted and exposed the company to weaknesses that were not previously identifiable, and the consequences impacted its financial stability.  Some of the specific resulting issues and ongoing challenges include the following: (1) material lease exposure from exited locations, (2) management turnover, (3) historic inflation and supply chain constraints, (4) tight labor market and wage inflation, (5) government mandated store closures to help control the spread the COVID-19 pandemic.

20.     Over the last several months, WWC management has taken significant steps to right size the business and begun to restructure the company for long-term success. Specific actions include the following, among others: (1) added experienced and focused management team with targeted expertise in operations, supply chain, marketing, and franchise relations, (2) established new leadership with the hiring of me and industry advisor Craig Miller, (3) significantly reduced the store base by eliminating stores that were demonstrating significant sales decline, impaired facilities, negative store EBITDA, and were unlikely to recover in an acceptable time horizon, (4) focused on re-establishing store operational control and re-deploying its most talented loyal store management toward its profitable operations resulting in positive trends in both sales and cost management, (5) materially  reduced corporate G&A -  to that end,  (6) negotiated terms with some of the key service providers/vendors, (7) provided additional capital to support the company's ongoing operations.

21.     While these actions are beginning to yield positive results and the Debtors expect this trend to continue, the Debtors have been unable to address some of the significant challenges stemming from the pandemic, but more importantly have been unsuccessful in restructuring its senior facility through HomeTrust.  The Debtors therefore determined that this Chapter 11 filing was necessary to avoid further actions by HomeTrust or other creditors that would threaten the Debtors' continued operations and to provide the Debtors the opportunity to address the claims and interests of all their stakeholders through a uniform process.

22.     The Debtors' main goal is to reorganize under a consensual Chapter 11 Plan that maximizes the value of their estates and provides the greatest return possible to all of their creditors and stakeholders.

## PART III: FIRST-DAY MOTIONS

**A.    Motion of the Debtors for Entry of an Order Directing the Joint Administration of Related Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) (the "Joint Administration Motion")**

23.     The Debtors request the joint administration of these Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the Aetius Companies, LLC case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases.

24.     The Debtors are direct affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. Joint administration of the Chapter 11 Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases. Joint administration will also permit the Clerk to use a single general docket for the Cases and to combine notices to creditors and other parties-in- interest of the Debtors'

respective estates. Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

25.     I understand that if the Court approves joint administration of the Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Cases and ease the administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Chapter 11 Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estate. Based on the foregoing, the Debtors believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted.

**B.      Motion of the Debtors for an Order : (I) Approving the Continued Use of their Bank Accounts, Cash Management System and Business Forms; (II) Granting a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Authorizing the Debtors' Banks to Charge Certain Fees and Other Amounts (the "Cash Management Motion")**

26.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the maintenance of their bank accounts and continued use of existing business forms; (ii) authorizing but not directing the continued use of their existing cash management system; and (iii) providing any additional relief required in order to effectuate the foregoing. The Debtors also request the right, in their discretion, to (i) pay any bank account related fees; and (ii) close or otherwise modify the terms of certain of the bank accounts and open new debtor-in-possession accounts as may be necessary to facilitate these Chapter 11 Cases and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Chapter 11 Cases.

27.     Further, while the Debtors historically do not keep balances over $250,000.00 in any accounts, should any of the Debtors' accounts exceed FDIC guidelines the Debtors will work with the United States Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator") to get into compliance with such provisions.

28.     The continued use of the cash management system and the bank accounts during the pendency of these Chapter 11 Cases is essential to the Debtors' business operations. The Debtors believe that the bank accounts and related cash management system mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close bank accounts and reestablish new accounts would not result in greater administrative controls and would require time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

29.     The cash management system is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (i) control and monitor revenue; (ii) ensure cash availability; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Moreover, continued operation of the cash management system is crucial to the Debtors' ongoing business operations.

30.     Without the relief requested, I believe the Debtors would be burdened in the effective and efficient maintenance of their financial operations. Such a result would cause significant harm to the Debtors' businesses and the value of their estates. Accordingly, I believe

that the relief requested is in the best interest of the Debtors, their estates and creditors, and all

parties in interest.

**C.**   **Motion of the Debtors for an Order Authorizing: (I) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs; (IV) Payments for Which Payroll Deductions Were Made; (V) Payment of All Related Costs and Expenses; and (VI) Continuation of Certain Prepetition Employee Programs (the "<u>Employee Wages and Benefits Motion</u>")**

31.   By the Employee Wages and Benefits Motion, the Debtors seek entry of entry of

interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or perform, as

applicable, prepetition obligations to current employees including accrued prepetition wages,

prepetition wage checks, salaries, and other cash and non-cash compensation claims (collectively,

the "<u>Employee Wage Obligations</u>"); (b) maintain and continue to honor their practices, programs,

and policies for their employees that were in effect as of the Petition Date, as such may be

modified, amended or supplemented from time to time in the ordinary course, including without

limitation, the continuation and maintenance of the Debtors' various employee benefit plans and

programs (and to pay all fees and costs in connection therewith, including those that arose

prepetition) (collectively, the "<u>Employee Benefit Obligations</u>"); (c) reimburse Employees for

prepetition expenses incurred on behalf of the Debtors in the ordinary course of business (the

"<u>Employee Expense Obligations</u>"); and (d) pay all related prepetition withholdings and payroll-

related taxes and deductions (the "<u>Employer Taxes and Deductions</u>" and collectively with the

Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and

Workers' Compensation Obligations, the "<u>Employee Obligations</u>") associated with the Employee

Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial

institutions to receive, process, honor, and pay all related checks and electronic payment request

for payment of any prepetition Employee Obligations.

32.     As of the Petition Date, the Debtors employ approximately 255 employees, of

which 188 are part-time or hourly and 67 are full-time or salaried employees (the "Employees").

33.     The Debtors' Employees perform a variety of critical functions, including operating

the 6 corporate run restaurants. The continued operations of the restaurants are essential to the

reorganization of the Debtors. In the ordinary course of business, the Debtors incur payroll

obligations for salaries, commissions and hourly wages owed to their Employees.  The Debtors

have two separate weekly payroll cycles that run on alternating weeks.  Each cycle pays for an

entirely separate set of employees.  For each cycle, the Employees are paid twice a month by direct

deposit and by checks and Payroll is paid five days in arrears. The average total monthly inclusive

of payroll obligations are approximately $657,689.69 (Gross amount, including payroll taxes,

health insurance, retirement, etc)  By the Employee Wages and Benefits Motion, the Debtors seek

to pay the Employees the amounts owed from the last pay period ending July 9, 2023 through the

Petition Date (the "Prepetition Wages") as and when due.  By the Employee Wages and Benefits

Motion, the Debtors seek authority to pay those amounts due for prepetitions period in the

following three payrolls:

   a.  On Tuesday, July 25, 2023, the Debtors will run payroll in the amount
       of $185,154.00 for the pay period ending July 16, 2023 (this entire
       amount is a prepetition obligation).

   b.  On Tuesday, August 1, 2023, the Debtors will run payroll in the
       amount of $57,741.00 for the pay period ending July 23, 2023 (which

will include approximately nine days of the prepetition period of July
10, 2023 to the Petition Date).

    c.   On Tuesday, August 8, 2023, the Debtors will run payroll in the
amount of $185,154.00 for the pay period ending July 30, 2023 (which
will include two days for the prepetition period of July 17, 2023 to the
Petition Date).

34.    In addition, the Debtors have contracted out certain back-office accounting
functions to INVGR Hospitality ("INVGR").  The Debtors estimate that they owe approximately
$21,315.00 to INVGR (the "Independent Contractor Obligation"), some of which may include
amounts owed prepetition.  The Debtors seek the authority to pay and honor Prepetition Wage
Obligations for Employees, Independent Contractor Obligation, and to continue to honor the
Employee Wage Obligations and the Independent Contractor Obligation on a postpetition basis in
the ordinary course of business.

35.    Further, the Debtors are seeking to pay Employee Benefit Obligations, Employee
Expense Obligations and Employer Taxes and Deductions, plus amounts due on the current pay
cycle.

36.    The Employees are essential to the continued operation of the Debtors' businesses,
and the Employees' morale directly affects their effectiveness and productivity. Many of the
Employees live paycheck to paycheck and would incur substantial hardship should they not be
paid. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel
policies, programs, and procedures that were in effect prior to the Petition Date. A loss of employee
morale and goodwill at this critical juncture would undermine the Debtors' stability, and

undoubtedly would have an adverse effect on the Debtors, their customers, the value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

37.    I believe that payment of all prepetition Employee Obligations and payment of the Independent Contractor Obligation in accordance with the Debtors' prepetition business practices will enable the Debtors to retain their employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.    Motion of the Debtors for an Order Authorizing and Approving (I) Interim Authority to Use Cash Collateral and (II) Setting Final Hearing on Authority to Use Cash Collateral (the "<u>Cash Collateral Motion</u>")**

38.    As noted herein, the Debtors believe that the best way to maximize the value of their estates, provide the greatest recovery for stakeholders, and preserve the on-going operations of the Debtors is through a Chapter 11 restructuring through a Chapter 11 plan of reorganization.

39.    In the Cash Collateral Motion, the Debtors seek authority to use cash collateral, on an interim basis, to pay certain post-petition obligations, including without limitation, which are critical for the continued operations of the Debtors over the next three weeks. The Debtors propose to use the cash collateral in accordance with a formal budget (the "<u>Budget</u>"), prepared by the Debtors, which is attached as Exhibit A to the Cash Collateral Motion. Because the amount and timing of all expenses cannot be predicted exactly, the Debtors propose that they be considered in compliance with the Budget so long as the Debtors do not exceed the Budget by more than 10% per line item on a weekly basis.

40.    The Debtors will suffer immediate and irreparable harm to their operations and ability to reorganize if the Debtors are unable to obtain authority to use cash collateral on an emergency basis as described in the Cash Collateral Motion  In the absence of a court order authorizing the use of cash collateral to fund critical needs, the Debtors will be unable to meet their

operating expenses and will be forced to cease operations immediately, rather than reorganizing their business structures in order to maximize value for the bankruptcy estates and creditors. Without immediate access to cash, the Debtors' inability to pay its ordinary operating expenses would lead to a quick collapse of their business enterprise. Therefore, the Debtors request an order authorizing the immediate use of cash collateral for their continued business operations in accordance with the budget attached as Exhibit A to the Cash Collateral Motion

41.    The value of the Debtors' assets and the collateral, especially receivables, will also deteriorate rapidly if the Debtors are not permitted to access cash collateral. As a result, the Debtors' ability to fashion an effective plan to satisfy secured, priority, and other claims will be irreparably impaired.

42.    I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**E.    Debtors' Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "Utilities Motion")**

43.    In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water, telephone, security and/or similar services with various utility companies (collectively, the "Utility Providers").

44.    Uninterrupted utility services are essential to ongoing operations and, therefore, to the ultimate success of the Debtors' reorganization. Should the Utility Providers refuse or discontinue service, even for a brief period, Debtors' business operations would be disrupted. The impact on the Debtors' ability to conduct their businesses would be significant and would

jeopardize the Debtors' reorganization efforts. It is therefore critical that utility services continue uninterrupted.

45.    To avert disruption to their businesses, the Debtors would be required to pay whatever amounts are demanded by the Utility Providers to avoid the cessation of necessary services. Accordingly, the Debtors seek the entry of an order prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition invoices, authorizing the Debtors to pay a deposit of one month's average billing to the Utility Providers, deeming Utility Providers adequately assured of future performance, and establishing procedures for determining requests for additional adequate assurance of payment.

46.    The Debtors submit that their ability to continue paying for utility services is adequately assured for a number of reasons. First, the Debtors should have adequate liquidity through their operations and cash on hand to pay for postpetition utility services on a current basis. Additionally, the Debtors propose to make a deposit of one month's average billing with each Utility Provider.

47.    I am advised by counsel that under the relief requested in Utilities Motion, the Utility Providers retain the right to seek additional adequate assurance.

48.    Accordingly, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates and their creditors.

**F.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Prepetition Customer Practices and Programs in the Ordinary Course of Business (the "Customer Programs Motion")**

49.    Prior to the Petition Date, in the ordinary course of their businesses and as is customary in the industries in which the Debtors operate, the Debtors implemented certain Customer Programs, including the following:

### The Customer Reward Program

50.     The Debtors' Customer Reward Program is an app-based promotional and loyalty program.  Users download the application, which then gives users access to email marketing, the loyalty program, the reward program, and online ordering in restaurants.  For every dollar spent in a purchase within Wild Wing Cafe, the customer earns points.  Once a guest earns enough points, they can exchange their points for different rewards.  Such rewards include different quantities of wings or a $50.00 food reward when the customer spends $500 within a store.  The Customer Reward Program is estimated to cost Debtors approximately $275.00 per location per month.

### The Gift Card Program

51.     In addition, the Debtors offer customers access to a Gift Card Program, which allows customers to purchase gift cards that can later be redeemed for services in one of the restaurant locations.  The Gift Card Program is supported by two vendors, NCR and Incomm.

52.     The first Gift Card Program is supported by NCR. The NCR Gift Card Program allows customers to purchase a card for a desired amount that will be put onto a physical card at the restaurant.  The guest pays for the gift card and the desired amount at the point of sale.  Then, the purchase amount is deposited into a clearing house where it is held until the gift card is redeemed by a customer.  The NCR Gift Card Program is available to the Debtor at no additional charge, as it is included in the Essentials Program with NCR.

53.     The second Gift Card Program is supported by Incomm.  Incomm facilitates and places orders for gift cards between big box stores and WWC.  After WWC receives a request, they will activate the requested number of gift cards.  Then, WWC will bill Incomm for the amount activated, which will be paid 90-days later.  Those funds are then deposited into the same clearing house account as NCR to be used when the gift card is redeemed.  WWC customers purchase these

gift cards at either Sam's Club or BJ's with a predetermined amount of $50.00. This program costs the Debtors 33% of the activated amount.

54.    The Customer Award Program and the Gift Card Program allow the Debtors to meet competitive pressures, ensure customer satisfaction, and generate goodwill with customers, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability. Maintaining these benefits throughout these chapter 11 cases is essential to the continued viability of the Debtors' businesses and the maximization of the estates' value for all parties-in-interest.

55.    The relief requested will also benefit the Debtors' creditors. If the Debtors were prevented from honoring the Customer Awards Program and the Gift Card Program consistent with past business practices, the customers' lost goodwill in the Debtors will damage the Debtors' business to a greater extent than the cost of honoring and continuing these practices. Therefore, approval of the Customer Award Program and the Gift Card Program will protect the Debtors' goodwill and the going concern value during this chapter 11 process.

56.    By the Customer Programs Motion, the Debtors request authority to honor the Customer Rewards Program and prepetition Gift Cards and to continue honoring, in their sole discretion, Gift Cards issued postpetition in the ordinary course of their business.

57.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

## PART IV:  CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be

substantially enhanced if the Court grants the relief requested in each of the First Day Motions and

I respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: July 20, 2023

*/s/ Mark Cote*
Mark Cote
CEO

# **<u>EXHIBIT A</u>**





3